# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **RANDY D. CARROLL,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:09cv00058 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE,** | ) | |
| Commissioner of Social Security, | ) | By: PAMELA MEADE SARGENT |
| Defendant. | ) | UNITED STATES MAGISTRATE JUDGE |

*I. Background and Standard of Review*

The plaintiff, Randy D. Carroll, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2009). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more

than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Carroll protectively filed his application for DIB on February 21, 2006, alleging disability as of August 14, 2004, based on mental illness, learning disability, back, kidney and nerve problems, spine compression and diabetes. (Record, ("R."), at 10, 120-22, 161, 175.) The claim was denied initially and upon reconsideration. (R. at 70-75, 77, 78-80.) Carroll then requested a hearing before an administrative law judge, ("ALJ"). (R. at 85.) The ALJ held a hearing on July 10, 2007, at which Carroll was represented by counsel. (R. at 23-66.)

By decision dated December 20, 2007, the ALJ denied Carroll's claim. (R. at 10-22.) The ALJ found that Carroll met the nondisability insured status requirements of the Act for DIB purposes through September 30, 2009. (R. at 15.) The ALJ also found that Carroll had not engaged in substantial gainful activity since January 2006. (R. at 15.) The ALJ found that the medical evidence established that Carroll suffered from severe impairments, namely degenerative disc disease, diabetes mellitus, depression, borderline intellectual functioning and polysubstance dependence/abuse, but he found that Carroll did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16-17.) The ALJ also found that Carroll had the residual functional capacity

to perform light work[1] that was simple and routine with easy to learn work instructions consistent with unskilled work and that did not require more than occasional climbing of stairs/ramps, kneeling, crouching, crawling and stooping and did not require any climbing of ropes, scaffolds or ladders or exposure to vibrations or hazards. (R. at 18-21.) Therefore, the ALJ found that Carroll was able to perform his past relevant work. (R. at 22.) Based on Carroll's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ also found that other jobs existed in significant numbers in the national economy that Carroll could perform, including jobs as a parking lot enforcer, a packager, a cleaner and an assembler. (R. at 22.) Thus, the ALJ found that Carroll was not under a disability as defined under the Act, and he was not eligible for benefits. (R. at 22.) *See* 20 C.F.R. §§ 404.1520(f)(g) (2009).

After the ALJ issued his decision, Carroll pursued his administrative appeals, (R. at 6), but the Appeals Council denied his request for review. (R. at 1-3.) Carroll then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2009). This case is before the court on Carroll's motion for summary judgment filed February 22, 2010, and on the Commissioner's motion for summary judgment filed March 18, 2010.

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2009).

*II. Facts*

Carroll was born in 1961, which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). (R. at 29.) Carroll went to school through the seventh grade and has past work experience as a collection attendant for Goodwill Industries and a loader/unloader at Walmart. (R. at 29-30, 34-35, 38-39.) Carroll does not challenge the ALJ's finding that his past relevant work at Goodwill was simple, unskilled, light work. (R. at 22.)

In rendering his decision, the ALJ reviewed medical records from Piedmont Community Services; Carilion Franklin Memorial Hospital; Primary Care Associates of Martinsville; Carilion Roanoke Community Hospital; Urology Associates; Dr. Bede A.R. Pantaze, M.D.; Julie Jennings, Ph.D., a state agency psychologist; Dr. Donald Williams, M.D., a state agency physician; Free Clinic of Franklin County; Carilion Neurosurgical Care; Dr. Michelle Campbell, M.D.; and Dr. Robert Cassidy, M.D.

The record shows that Carroll has sought sporadic treatment for several physical complaints including back problems, kidney stones and diabetes. The record does not contain any evidence from any of Carroll's treating physicians placing any specific restrictions on his work-related abilities. The only evidence from any of his treating physicians regarding his work-related abilities is an August 14, 2006, statement from Dr. Michelle Campbell, M.D., of Primary Care Associates stating that Carroll was "completely disabled." (R. at 562.) According to the record, however, the last time that Dr. Campbell saw Carroll prior to August 14, 2006, was on June 2, 2005. (R. at 351.) Dr. Campbell treated Carroll for low back pain on only five occasions –

November 17, 2004, December 17, 2004, February 9, 2005, June 2, 2005, and December 13, 2006. (R. at 351-58, 564-65.) None of these records mentions any restrictions on Carroll's work-related abilities. On three of these occasions, Carroll's straight leg raising was normal. (R. at 352, 354, 356.) There is no indication that this testing was done on November 17, 2004, or December 13, 2006. On November 17, 2004, Carroll complained of tenderness and spasms in his neck and back. (R. at 358.) On December 17, 2004, Carroll had vertebral tenderness and decreased range of motion in his back. (R. at 355.) On February 9, 2005, Carroll complained of muscle spasm and tenderness over the L4-5 level of his lower back. (R. at 353.) His back and neck also were nontender and had painless range of motion on June 2, 2005. (R. at 351.) On December 13, 2006, Carroll exhibited muscle spasm, tenderness and limited range of motion in his low back. (R. at 564.) None of Dr. Campbell's records makes any mention of Carroll complaining of or being treated for mental health symptoms.

Dr. Campbell did recommend more testing and evaluation, and on June 14, 2006, Carroll was seen by Dr. Zev. Elias, M.D., of Carilion Neurosurgical Care. (R. at 558.) Carroll told Dr. Elias that he had experienced back pain for the past two to three years. (R. at 558.) Carroll complained of pain radiating from his lower back into both legs to the knees. (R. at 558. ) He also complained of numbness and swelling in both feet. (R. at 558.) Dr. Elias noted that Carroll was in no acute distress, and motor testing was normal in the lower extremities. (R. at 558.) Dr. Elias noted that a December 4, 2005, MRI of Carroll's lumbar spine demonstrated a disc bulge at the L4-5 level. (R. at 558.) Dr. Elias stated that the MRI findings were not surgically significant. (R. at 558.) Dr. Elias recommended a course of physical therapy and placed no restrictions on Carroll's work-related abilities. (R. at 558.)

On May 10, 2006, Dr. Donald Williams, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment on Carroll. (R. at 429-33.) Dr. Williams found that Carroll was capable of performing the full range of medium exertional work. (R. at 430.)[2] Another state agency physician, Dr. Michael J. Hartman, M.D., reviewed and affirmed Dr. Williams's assessment on December 13, 2006. (R. at 433.)

The record also shows that Carroll also has a long history of substance abuse and mental health problems. Carroll was admitted to Southwestern Virginia Mental Health Institute from February 11 to February 23, 1998. (R. at 319-20.) Carroll's diagnosis on discharge was marijuana and alcohol dependence. (R. at 319.) Carroll also was voluntarily admitted for inpatient psychiatric treatment at Memorial Hospital of Martinsville and Henry County from September 28 to September 30, 2004. (R. at 265-66.) The Discharge Summary noted that Carroll came to the hospital depressed asking for help after being fired from his job at Walmart. (R. at 265.) Carroll was diagnosed as suffering from major depression, recurrent, severe, with cannabis abuse. (R. at 265.) Carroll was discharged to follow up with Piedmont Community Services, ("PCS"), for continuing mental health treatment. (R. at 266.)

Carroll began treatment with PCS on October 6, 2004, for depression pertaining to relationship problems. (R. at 346.) He was discharged by PCS on July 11, 2005, due to transportation problems. (R. at 346.) A Transfer/Discharge Summary noted that Carroll had made "modest gains" while in treatment. (R. at 346.) Records show that

---

[2]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If an individual can do medium work, that person also can perform sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2009).

Carroll attended monthly sessions at PCS from February to July 2005, but that he missed many sessions. (R. at 331-47.) The records also reflect that, during his treatment, Carroll requested a change in counselors because he did not like being told he was alcohol dependent. (R. at 347.) According to the note, Carroll also was using marijuana, but claimed that he could "quit at any time." (R. at 347.) The note continued to state that Carroll did not "demonstrate a readiness to stop." (R. at 347.)

While treating with PCS, Dr. P. C. Patel, M.D., performed a psychiatric evaluation of Carroll on January 25, 2005. (R. at 324-26, 328.) Dr. Patel noted that Carroll was not psychotic, not manic, not overly paranoid and did not suffer from any hallucinations. (R. at 324.) Dr. Patel stated that Carroll was feeling frustrated and angered easily. (R. at 324.) Carroll told Dr. Patel that he was a recovering alcoholic and that he was abstaining from alcohol. (R. at 324.) He also said that he had smoked marijuana on and off for 27 years, with his last use two weeks prior to Dr. Patel's evaluation. (R. at 324.)

Dr. Patel found Carroll to be oriented and of average intelligence. (R. at 325.) Carroll's appearance, behavior, speech, thought processes, thought content, perception and range of affect all were within normal limits. (R. at 327.) Dr. Patel also found Carroll's immediate, recent and remote memory to be intact. (R. at 325.) Dr. Patel diagnosed Carroll as suffering from depressive disorder not otherwise specified, cannabis abuse and a past history of alcohol dependence. (R. at 325.) Dr. Patel assessed Carroll's Global Assessment of Functioning, ("GAF"), score at 55.[3] (R. at

---

[3]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32

325.) Dr. Patel recommended psychotherapy and prescribed Lexapro. (R. at 326.) Dr. Patel advised Carroll to not smoke marijuana or use alcohol. (R. at 326.)

On February 2, 2005, Carroll admitting to smoking marijuana the previous week. (R. at 344.) PCS records show that Carroll called on March 3, 2006, wanting his records changed because Dr. Patel had misdiagnosed him as a substance abuser. (R. at 329.) On March 9, 2005, Carroll stated that he had discontinued taking Lexapro three weeks earlier claiming that it had not helped and had left "permanent damage." (R. at 339.) Also on March 9, when his counselor suggested that he focus on what he could do to move forward in his life, rather than simply blaming others, Carroll became angry and threatened to leave. (R. at 339.) Carroll stated that he was smoking three to four "joints" of marijuana a week. (R. at 339.) On March 18, 2005, Carroll reported moderate depression with his energy improving. (R. at 338.) He complained of difficulty sleeping due to pain and a loss of appetite. (R. at 338.) He also complained of a loss of short-term memory and irritability. (R. at 338.) Carroll reported that he continued to use marijuana and had taken some Xanax the previous week. (R. at 338.)

On April 5, 2005, Carroll reported feeling depressed, but he stated that he had not smoked marijuana in the previous two weeks. (R. at 336.) Carroll stated that not using alcohol or marijuana was causing him stress. (R. at 336.) Carroll stated that he had bought a gun and had thoughts of killing himself or others. (R. at 336.) Carroll did stated that he had no plans to shoot himself or others, but that he would harm himself

---

(American Psychiatric Association 1994). A GAF of 51-60 indicates "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

if he was sentenced to jail time for failing to pay his child support. (R. at 336.)

Notes from May 19 and June 9, 2005, stated that Carroll claimed that he continued to abstain from alcohol and marijuana. (R. at 330-31.)

Bede A.R. Pantaze, a licensed clinical psychologist, performed a mental status evaluation including intelligence testing on Carroll on May 8, 2006. (R. at 415-23.) Pantaze noted that Carroll was not a reliable historian with regard to his substance abuse problems. (R. at 415.) Pantaze stated that "Carroll was not considered to give any credible information and he deliberately slanted all information to make him appear excessively disabled. It is postulated that many, if not most/all of his alleged physical problems emanate from his long history of Cannabis and Alcohol abuse, which may not be in current remission as he reports. (R. at 419.) Pantaze also noted that mental health records showed that Carroll had been noncompliant with treatment and had discontinued treatment. (R. at 415.) Pantaze found no evidence that Carroll suffered from any mental illness or learning disability. (R. at 415.)

Pantaze stated that Carroll was oriented, and Pantaze observed no apparent deficits in attention and concentration. (R. at 417.) Carroll's memory appeared intact, and he was able to comprehend simple instructions. (R. at 417.) Pantaze stated: "From a mental status point of view, ... Carroll is able to do some detailed employment tasks just as he has done in the past...." (R. at 418.) Pantaze stated that Carroll was capable of maintaining regular attendance, performing work activities on a consistent basis and completing a normal workday/workweek without interruptions, accepting instructions form supervisors, interacting with co-workers, dealing with the

public on a limited basis and dealing with the usual stresses encountered in competitive employment. (R. at 418.) According to Pantaze, "Carroll does not have mental health issues which prevent him from employment if in fact he is interested in employment. The prognosis, if he chooses to be employed, is quite good." (R. at 418.) Pantaze diagnosed Carroll as suffering from a need to rule out polysubstance dependence, noncompliance with treatment and an adjustment disorder unspecified. (R. at 419.)

Pantaze placed Carroll's GAF score at 65-70.[4] (R. at 419.) Pantaze also administered the Weschler Adult Intelligence Scale-Third Edition, ("WAIS-III"), on which Carroll obtained a verbal IQ score of 76, a performance IQ score of 80 and a full-scale IQ score of 76. (R. at 420.) Pantaze stated that the test results were "believed to be a marginal estimate of ... Carroll's current level of intellectual functioning, with several more points possible but still falling within the borderline range of cognitive functioning." (R. at 421.) According to Pantaze, "[i]ndividuals of similar intellectual ability usually function best in unskilled or semiskilled occupations, which involve concrete relatively repetitive tasks. Some supervision is usually necessary except for tasks which have been well-practiced." (R. at 423.)

State agency psychologist, Julie Jennings, Ph.D., completed a Mental Residual Functional Capacity Assessment on May 10, 2006. (R. at 426-27.) Jennings stated that Carroll was moderately limited in his ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods,

---

[4]A GAF score of 61-70 indicates "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... , but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes and to set realistic goals or make plans independently of others. (R. at 426-27.) Jennings opined that Carroll was limited to simple, unskilled work. (R. at 428.)

Jennings also completed a Psychiatric Review Technique form, ("PRTF"), on May 10, 2006. (R. at 435-49.) On the PRTF, Jennings indicated that Carroll had moderate restrictions of activities of daily living, moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence, or pace. (R. at 445.) Jennings also stated that Carroll had one or two episodes of decompensation, each of extended duration. (R. at 445.)

On reconsideration on December 14, 2006, state agency psychologist Louis A. Perrott, Ph.D., reviewed and affirmed Jennings's May 10, 2006, PRTF. (R. at 435.) Perrott noted that the record did not contain any new diagnosis or treatment of Carroll for mental conditions. (R. at 449.) Perrott stated that there was no objective evidence of any decrease in Carroll's levels of adaptive functioning. (R. at 449.)

On May 28, 2006, Carroll was admitted to Carillion Roanoke Memorial

Hospital for complaints of depression. (R. at 461-62.) Carroll stated that he had felt suicidal for a few days and had thoughts of ingesting chemicals or jumping from a vehicle. (R. at 461.) Carroll was disheveled with poor hygiene. (R. at 461.) Psychomotor retardation was noted, and Carroll's affect was restricted. (R. at 461.) Carroll stated that he had attempted suicide three or four times in the past. (R. at 461.) A drug screen was positive for the use of opiates. (R. at 461.)

At the time of Carroll's admission, the counselor who assessed him stated that he was not able to care for himself and was not capable of consenting to voluntary treatment. (R. at 593.) The counselor stated that Carroll was unkempt, had slowed speech and a flat range of affect. (R. at 592.) Carroll also exhibited poor eye contact and psychomotor retardation. (R. at 592.)

Carroll was discharged on June 1, 2006, with a diagnosis of major depressive disorder with alcohol and cannabis abuse, in sustained full remission. (R. at 461-62.) On admission, Carroll's GAF was assessed at 25;[5] on discharge, his GAF was assessed at 50.[6] (R. at 461.) Carroll was prescribe Lexapro and trazodone and referred to PCS for follow-up mental health care. (R. at 462.)

Carroll was seen by Dr. Tiffany A. Taylor, M.D., at the Free Clinic of Franklin County, Inc., on June 8, 2006. (R. at 465.) Dr. Taylor prescribed Desyrel and Lexapro

---

[5]A GAF of 21-30 indicates that the individual's behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or an inability to function in almost all areas. *See* DSM-IV at 32.

[6]A GAF of 41-50 indicates "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32.

to treat Carroll's depression and urged Carroll to keep his appointment with PCS. (R. at 465.)

Carroll presented to Emergency Department at Carilion Franklin Memorial Hospital for a psychiatric evaluation on October 11, 2006. (R. at 569-70.) Carroll complained of visual and auditory hallucinations, suicidal and homicidal ideations, violent behavior and paranoid thoughts. (R. at 569.) Carroll stated that he "used to be a bad alcoholic," but claimed he had not consumed alcohol in months until the previous week. (R. at 569.) Dr. Ronald B. Low, M.D., noted that Carroll's speech was clear, his affect was normal, he was oriented and he responded appropriately to questions. (R. at 569.) Dr. Low stated that Carroll was in "obvious moderate discomfort from anxiety. (R. at 569.) Dr. Low diagnosed adjustment disorder, alcohol abuse, anxiety, depression, drug abuse, eating disorder, hyperventilation syndrome and schizophrenia. (R. at 569.)

PCS performed an emergency assessment on October 12, 2006, but determined that Carroll did not intend to harm himself at that time. (R. at 588-89.) Carroll reported that he had experienced auditory hallucinations earlier in the week. (R. at 588.) Carroll reported feeling better after speaking with the counselor. (R. at 589.) Another emergency assessment was performed on Carroll on January 26, 2007. (R. at 586-87.) Carroll denied being suicidal, and the counselor found that he was not a threat to himself or others. (R. at 587.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2009); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2009).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2003 & Supp. 2009); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its

judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

In his brief, Carroll argues that substantial evidence does not exist to support the ALJ's finding with regard to his mental residual functional capacity. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 9-16.) Carroll also argues that the ALJ erred by failing to give controlling weight to the opinion of Dr. Campbell that Carroll was totally disabled. (Plaintiff's Brief at 16-18.)

The ALJ in this case found that Carroll had the mental residual functional capacity to perform work that is simple and routine with easy-to-learn work instructions consistent with unskilled word. (R. at 18-21.) Based on my review of the

record, I find that substantial evidence exists to support this finding. None of Carroll's mental health care providers have placed any restrictions on his work-related abilities. In fact, the only opinions placing any restrictions on Carroll's mental residual functional capacity are those of the state agency psychologists, and they both agreed that Carroll could perform simple unskilled work. (R. at 428, 449.) The only physician placing any greater restrictions on Carroll's residual functional capacity than those found by the ALJ was Dr. Campbell's one paragraph note stating that Carroll was "completely disabled."

While the ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability, 20 C.F.R. § 404.1527(d)(2) (2009), "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

The ALJ rejected Dr. Campbell's opinion that Carroll was disabled because it was not supported by the other evidence of record. Again, there is no evidence that Dr. Campbell ever treated Carroll for any mental health symptoms. It appears that Dr. Campbell's statement was based solely on Carroll's physical impairments. The ALJ's rejection of Dr. Campbell's assessment of Carroll's physical work-related abilities is supported in the record by the benign MRI findings and Dr. Elias's evaluation. Thus, it appears that the ALJ properly weighed the medical evidence and that his findings

are supported by the record.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists to support the ALJ's weighing of the medical evidence;

2. Substantial evidence exists to support the ALJ's finding with regard to Carroll's residual functional capacity; and

3. Substantial evidence exists to support the ALJ's finding that Carroll is not disabled under the Act.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Carroll's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the final decision of the Commissioner denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2009):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the

court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED: May 20, 2010.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE